**JUDGE NATHAN**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

ACE ARTS, LLC,

               Plaintiff,

     v.

SONY/ATV MUSIC PUBLISHING, LLC and
APPLE CORPS LIMITED,

               Defendants.
--------------------------------------------------------------



13 CIV 7307

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Ace Arts, LLC ("Ace"), for its Complaint against defendants Sony/ATV Music

Publishing, LLC ("Sony/ATV") and Apple Corps Limited ("Apple Corps"), alleges as follows:

### NATURE OF THE ACTION

1.     Defendants have wrongfully interfered with plaintiff's contract to distribute a

documentary film, *The Beatles: The Lost Concert* (the "Documentary"), about the initial impact

of The Beatles in America from the vantage point of the group's first United States concert, held

on February 11, 1964 in Washington, D.C. (the "D.C. Concert"). Defendant Sony/ATV, to curry

favor with defendant Apple, asserted spurious copyright infringement threats with respect to a

public domain tape of the D.C. Concert included in the Documentary. That historic concert was

filmed for theatrical release and had two official theatrical showing dates a few months after the

D.C. Concert included in the Documentary. That historic concert was filmed for theatrical

release and had two official theatrical showing dates a few months after the D.C. Concert. The

company that funded, taped, and exhibited the D.C. Concert allowed the film of the concert (the

"Tape") to be transferred without copyright protection. No copyright was ever filed on the

performances recorded on the Tape or the Tape itself. A copy of the Tape was acquired by an

entity which has allowed the Producers (hereinafter defined) of the Documentary to use it for exhibition purposes.

2.      The Tape is 35 minutes long and is embedded in the 86-minute Documentary, the exhibition rights to which are controlled by Plaintiff Ace.  The Documentary was produced by an award-winning team specializing in the production of documentary films in the music/performance genre.  In addition to the amounts paid to acquire the Tape, over a million dollars were spent producing and marketing the Documentary.  These sums were to be recouped through the exhibition of the Documentary, and subsequent derivative marketing and sales of the Documentary in various media.  Defendants' wrongful interference prevented such exhibition and sales.

3.      The high quality, marketability, and historical importance of the Documentary was such that a major exhibitor, Screenvision Exhibition, Inc. ("Screenvision"), contracted to exhibit the Documentary in theaters across the United States on a limited basis as a prelude to, and to generate national awareness of, the Documentary before it was marketed to domestic cable outlets, DVD distributors, wholesalers and retailers, and other media distribution entities. The box office gross was reasonably projected to be over $50 million dollars counting an anticipated extended run at more theaters.  The initial domestic theatrical distribution, however, was the key because—like the business model for subsequently distributing and selling first run movies to DVD and cable - other sales into derivative channels depend on the success and scale of the initial theatrical exhibition.

4.      Ace and Screenvision executed a distribution contract dated September 27, 2011, and an amendment thereto, a copy of which is attached as Exhibit A (collectively the "Distribution Contract"), specifically addressed to the Documentary.  Pursuant to the

2

Distribution Contract, Ace and Screenvision contracted with more than 500 theatres across the United States, sold tickets, and invested in promotion, publicity, and advertising for the anticipated nationwide exhibition. The Documentary was to debut at the Ziegfeld Theater in New York City on May 6, 2011. The Ziegfeld premiere was the subject of stories in national and local trade and general interest media. *See* Exhibit B. At the time of the planned exhibition Screenvision believed it could, and was seeking, to add another 500 theatres to the exhibition schedule and to extend the initial run of showings from 2 days to 2 weeks.

5.     The publicity of the scheduled screenings alone elicited interest in the licensing of the Documentary by two American television networks and two DVD labels, as well as major national and international media and Internet coverage.

6.     At the eleventh hour, before the early May premier, Sony/ATV, at the insistence of, and in conspiracy with, Apple Corps, wrongfully interfered with the Distribution Contract by (i) making false statements directly to Screenvision (and likely others) concerning Ace's legal right to exhibit the Documentary; (ii) making unjustified threats of legal action; and (iii) filing a baseless lawsuit in England against parties which were not parties to the exhibition contracts in the U.S. for the sole purpose of interfering with the planned distribution in the United States.

7.     Defendants' interference was deliberate and knowingly baseless, as both Sony/ATV and Apple Corps knew that neither had a copyright in the Tape or any other legal basis to bar the exhibition of the Documentary in the United States.

8.     These actions caused Screenvision to refuse to perform under the Distribution Contract and caused the Ziegfeld Theater and other theaters to cease sale of tickets and cancel already-planned and publicized showings. As a result, Plaintiff was deprived of the monetary benefits of the Distribution Contract, and the post-theatrical distribution potential of the

3

Documentary was prevented from being realized. Plaintiff was damaged financially, reputationally, and artistically.

9.      Defendants' interference with the valuable contract between Ace and Screenvision led to the financial ruination of Ace and the producers of the Documentary.

10.     In addition, consumers were deprived of (i) a worthwhile and historically important addition to the historical, cultural and artistic analysis of The Beatles' initial foray into the United States; and (ii) an alternative to Apple Corps' 2010 limited release of a film that incorporated the Tape and later was made available only to those who purchased The Beatles Anthology through the iTunes Store. The public lost the opportunity to see a documentary of educational value for pop culture history generally and US-British cultural cross-pollination and *The Beatles* and British Invasion historical aspects in particular.

11.     Defendants' conduct gives rise to (i) a claim under the Sherman Antitrust Act; (ii) claims for tortious interference with contract; (iii) claims for interference with prospective economic relations; (iv) a claim for common law unfair competition under New York law; (v) a claim for declaratory judgment concerning Sony/ATV's misuse of its copyrights on certain Beatles'\compositions; and (vi) a claim under New York General Business Law § 349.

## II. PARTIES

12.     Ace is a New York Limited Liability Company located at 101 Greene Street, New York, New York and was a party to, and beneficiary of, the Distribution Contract with Screenvision and the amendments thereto.

13.     Sony/ATV is a limited liability company and the publisher of certain John Lennon/Paul McCartney compositions. Formed under the laws of the state of Delaware, with one of its principal places of business in New York, New York, Sony/ATV is part of an

international music publishing group owned 50% by Sony Corporation and 50% by the estate of Michael Jackson.

14. Apple Corps Limited ("Apple Corps") is a UK registered company through which The Beatles' business interests are conducted. Apple Corps operates throughout the United States, including in Los Angeles and New York.

## III. JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, and 1338 because, *inter alia*, it is an action brought under the laws of the United States, including the Sherman Act, 15 U.S.C. § 1, the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and the Copyright Act, 17 U.S.C. § 101, *et seq*.

16. This Court also has supplemental jurisdiction over Ace's state law claims pursuant to 28 U.S.C. § 1367.

17. Pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391, venue is proper in the Southern District of New York because the exhibition which Defendants interfered with was scheduled to begin in New York City and Ace Arts, LLC is headquartered here.

## IV. SUBSTANTIVE ALLEGATIONS

### A. The D.C. Concert Was Taped And Had An Initial Theatrical Exhibition

18. The D.C. Concert, the first live public concert performance by The Beatles in the United States, took place on February 11, 1964 at the Coliseum in Washington, D.C. According to music critics, the D.C. Concert signified the first incursion of the "British Invasion" into U.S. popular culture (*i.e.*, the appearance in America of a multitude of British music performers, including "The Rolling Stones," "Herman's Hermits," "Lulu," and others who changed forever the musical, cultural, style and artistic attitude of Americans, and which changed the nature of

5

the music and entertainment industry in all aspects). The concert featured *The Beatles* performing twelve songs. It is arguably the single most important concert *The Beatles* ever performed and widely recognized as having immense historical importance to the public record in this field.

19.     The D.C. Concert was filmed by the National General Corporation ("NGC"), an insurance and entertainment company. It was recorded on a two-inch standard American "quad" videotape with an eight-man crew, and was mixed live on location.

20.     Embedded in the Tape are the performances of eight original compositions (the "Songs") to which Sony/ATV claims copyrights and four cover versions of songs written by other musicians. Aside from bootleg recordings, the Tape is the only complete extant recording of a Beatles' concert.

21.     The filming of the D.C. Concert was authorized by the performers and the then-owners of the copyrights in the songs. The Tape reflects a "credit" to *The Beatles'* authorized representatives, then-manager Brian Epstein and to NEMS, Epstein's management company who were also each individual member's authorized representative.

22.     The Tape was a "work made for hire" for NGC and thus the right to any copyright in the original video elements of the Tape belonged to NGC, not *The Beatles* or Sony/ATV or Apple Corps or *The Beatles'* then-record label or any individual member of *The Beatles*.

23.     The Tape was screened via a closed-circuit telephone network to theaters in the United States in March 1964, approximately one month after the D.C. Concert. It is estimated that more than 500,000 people paid to attend these theatrical screenings – nearly 4 times the attendance of the world famous Woodstock Music Festival, regarded as the most recognized concert event of all time.

6

**B.**     **The Rights To The Tape Of The D.C. Concert Are In The Public Domain**

24.     Publication of the Tape occurred by at least 1974 when it was sold without copyright protection, after which the Tape became immediately and permanently dedicated to the public domain.

25.     In the early 1970's, Eugene Klein, NGC's Chairman and major stockholder, transferred ownership and custody of the Tape to Malcolm Klein, also an executive at NGC. NGC's successor, American Financial Company, eventually liquidated NGC's assets in 1974 and 1975.

26.     In 1987, James Karnbach acquired the Tape from Malcolm Klein. Mr. Karnbach made a Betacam copy of the Tape. Mr. Karnbach sold the original master copy of the Tape to Apple Corps in 1995, but retained the Betacam copy of the Tape. Mr. Karnback's statement is attached hereto as Exhibit C.

27.     According to Karnbach, two transfers of the Tape were made before 1989 without copyright notice.

28.     The first of these pre-1989 transfers occurred when Eugene Klein transferred ownership of the Tape in the early 1970s, when any rights NGC had in the footage would have been vested therein. No one has ever contended Eugene Klein was not authorized to dispose of the master Tape on behalf of NGC.

29.     The second of the pre-1989 transfers took place in 1987, when Malcolm Klein sold the Tape to Karnbach without attaching any prescribed copyright notices or mentioning any such copyrights in the accompanying documentation.

30.     Mr. Karnbach has confirmed that there was no copyright notice on the copy of the film he purchased–not in the film itself, on the reel, or on the packaging. *See* Exhibit C.  Other evidence corroborates his statement, such as photographs.

31.     Photographs of the Tape and its box are shown on the website http://www.beatlesource.com/bs/to-washinton1.html titled "Washington Coliseum February 11, 1964" and captioned: "Thie [sic] reel of video tape was auctioned by It's Only Rock And Roll in 2005."  The auction's description of the Tape—reproduced beside the photographs on the website—included the following statements:

> There exists no title or copyright regarding this show and no copyright notices are seen on this master tape.  In addition, the company that filmed and produced the presentation has been out of business for over 35 years.
>
> The videotape has been inspected and viewed at a professional lab (keep in mind that this format has been obsolete since 1980) and the technician concurs that this tape is, indeed, the first generation master!  He has supplied a letter to that effect, in addition to detailing the procedure of how to deal with this obsolete format.  The actual reel and box in which the tape has been housed since 1964 weighs in at approximately 25 pounds.
>
> A screening can be arranged in Manhattan for seriously interested bidders that meet certain qualifications.
>
> We can unequivocally say that there exists no other videotaped Beatles concert that remotely approaches the quality of this performance by The Beatles at Washington Coliseum.

*See* Ex. D.

32.     According to a Copyright Research Report dated July 27, 2010, the Tape was commercially exploited, multiple times between 1964 and 2010. *See* Exhibit E.  No notice of copyright in the Tape was provided upon the occasion of any of these publications.  Nor is any registration of a claim of copyright reflected in the records of the United States Copyright Office.

8

Accordingly, the Tape entered the public domain as a result of the failure to copyright and is available for commercial exploitation, notwithstanding the objection of the owners of copyrights in the Songs.

33.     Apple Corp's conduct along with the conduct of other re-packagers confirms the conclusion that the Tape is in the public domain.

34.     When Apple Corps. Ltd. registered the 1991 motion picture *The Beatles: The First US Visit,* it did not claim copyright in the Tape.

35.     Although the Tape was included in *The Beatles Anthology* and *The Beatles Anthology No. 1-8* video cassettes, which Apple Corps registered for copyright on December 5, 1991 and October 5, 2003, respectively, the requested copyright was claimed only on compilations and editing of old materials and new cinematography, new materials, texts, sounds and photos, not the Tape.

36.     In 1998, Apple Corps released *The Beatles First U.S. Visit,* a DVD (later re-released in 2004 and screened in LA in 2011) which contained excerpts of the Tape.  That release did not reflect any copyright in the Tape.

37.     In or about October 2003, Passport International Productions of California, Inc. ("Passport"), an active video content repackager, issued a videodisc entitled *The Beatles in Washington, D.C. Feb. 11th, 1964.*  Passport claimed copyright only on the editing and compilation of this work.  No copyright in the Tape was claimed.

38.     The Tape was again seen publicly in November 2010, when it appeared as part of a film that Apple Corps offered exclusively on iTunes Store as part of a promotion for the release of *The Beatles Anthology* on the web-based sales platform.

9

39.     No purported copyright holder of the Tape or the performances of the Songs therein has ever come forward to challenge these uses of the Tape, all of which preceded the aborted exhibition of the Documentary.

40.     The foregoing unprotected, unchallenged publications of the Tape, a so-called "derivative work,"[1] has carried the underlying compositions (incorporated by permission of their copyright owners) into the public domain as well.  The 1964 filming of the D.C. Concert was authorized by the performers and copyright owners of the Songs performed by *The Beatles;* it was never copyrighted.  No copyright holder of any of the Songs has ever objected to public exploitation of the Tape and therefore the underlying musical works performed by *The Beatles* during the D.C. Concert are freely available for use in connection with the exploitation of the Tape.

**C.  The Producers Of The Documentary Acquired The Right To Use The Tape For The Production Of A Documentary About The Beatles' First American Concert And Granted Distribution Rights To Ace To Exhibit It In The USA**

41.     In 2009, Karnbach sold Betacam a copy of the Tape and all right, title and interest thereto to Concert Magic, Inc. ("CMI").  CMI subsequently provided the Tape to WPMC Limited ("WPMC"), a production company that, together with Iambic Media Ltd. ("Iambic" and, collectively with WPMC, the "Producers"), produced the Documentary and granted distribution rights to Ace for use in the production, marketing and commercial exploitation of the Documentary.

---

[1]     Section 101 of the Copyright Act defines a derivative work as one "based upon one or more preexisting works, such as a . . . motion picture version . . . or any other form in which a work may be recast, transformed or adapted." 17 U.S.C. § 101.

42.     Iambic was an independent production company founded by acclaimed producer Chris J. Hunt.  Iambic produced over ten music documentaries between 2004 and 2007, including productions focusing on Joan Sutherland, Maria Callas, Elaine Stritch, *The Beatles*, Michael Jackson and ABBA.  Iambic has earned over fifty nominations and awards in major festivals worldwide, including two BAFTA awards and four EMMY awards.

43.     The production of the Documentary took several years of work beginning in approximately 2009.

44.     The Documentary consists of the entire D.C. Concert footage, fully digitally remastered, and newly original filmed sequences, including contemporary interviews with individuals and celebrities connected to the D.C. Concert as well as expert commentary on the cultural significance of the event.  The Documentary includes new and previously unseen interviews with *The Beatles'* associates, family members, journalists, disc jockeys, concert attendees, historians and renowned members of the music industry, including Chuck Berry, Sid Bernstein, Albert Hammond, Jr., Louise Harrison, Mark Ronson, Bruce Spizer, Steve Tyler, Joe Perry, and Mike Mitchell.

45.     The Documentary is an extended illustration of an important historical-cultural event, which the Documentary as a whole is designed to explore and explicate.  The Documentary's narration and the interpolated on-screen comments of cultural critics, musicians, and fans place the copyrighted music in a new context and thus constitutes a transformative creation.

46.     There is a public interest and benefit in having access to this piece of music history.  Indeed, Peter Brodsky, Sony/ATV's Senior Vice President, Legal and Business Affairs, told Iambic's Hunt that the Documentary was a film the public ought to see.

47.     Plaintiff's intent in using the Tape in the Documentary was not to attract attention solely to the Songs in the Documentary or to use the music, in its own right, for entertainment purposes.  Indeed, the sound quality with which the Songs are heard (in the original Tape and hence in the Documentary) is relatively poor; they represent the minimum quality needed to accomplish the Documentary's narrative goals.  Plaintiff's use of the Tape-including the Songs-is nonetheless integral to the purpose of the Documentary: to demonstrate the excitement and significance of *The Beatles'* "invasion" of the United States.

48.     Ace carefully and prominently avoided creating any misrepresentation of association with Apple Corps or The Beatles or endorsement thereby and avoided any trademark infringement or other violations of any rights, even agreeing to changes demanded by Apple Corps and/or Sony/ATV with respect to marketing of the Documentary.

### D.     Sony/ATV And Apple Corps Worked In Concert To Block The Exhibition Of The Documentary

49.     The songs performed by *The Beatles* in the Tape include:  (1) "Roll Over Beethoven"; (2) From Me To You"; (3) I Saw Her Standing There"; (4) "This Boy"; (5) "All My Loving"; (6) "I Wanna Be Your Man"; (7) "Please, Please Me"; (8) "Till There Was You"; (9) "She Loves You"; (10) "I Want To Hold Your Hand"; (11) Long Tall Sally; and (12) "Twist And Shout."

50.     Sony/ATV has asserted that it owns rights in the following compositions: "She Loves You"; "All My Loving"; "I Wanna Hold Your Hand"; "This Boy"; "From Me To You"; "I Saw Her Standing There"; and "I Wanna Be Your Man."  Sony/ATV has also asserted that it owns 66.66% of the rights in "Twist & Shout" (the "Songs").

12

51.     Sony/ATV has never provided any substantiation as to the extent and nature of the rights it owns in the "Songs."

52.     In or about 2009, Producers and Apple Corps discussed the Producer's use of the Tape. At that time, Apple Corps claimed rights only in the performers, publicity, and trademarks, not the Tape[2] or the Songs.

53.     At all relevant times, Sony/ATV led the Producers (and later Ace) to believe it owned all applicable copyright and publishing rights to the Songs. As a matter of sound, the Producers sought a "synchronization license" from Sony/ATV in 2009 and as a prelude to potential international distribution of the Documentary, and to commence a potential future business relationship to incorporate the marketing reach of Sony. Moreover, at the time, neither the Producers nor Ace had conducted the exhaustive research – undertaken later – which confirmed that the Tape enjoys no copyright protection and its inclusion in a Documentary in the USA would not infringe any of Defendants' rights.

54.     The Producers and Sony/ATV engaged in confidential negotiations (the "Negotiations") for a synchronization license. Producers requested Sony/ATV to keep information confidential. In reliance thereon, Producers made disclosures of proprietary information to Sony/ATV.

55.     On April 21, 2010, after viewing the footage, Sony/ATV made an offer to Hunt that included the terms of an agreement to provide royalties to Sony/ATV from the exhibition of

---

[2]     Apple Corps has never claimed copyright in the original footage-only in its original contributions to productions that also incorporated the original footage from the Tape (e.g., Apple Corps' original contributions to the film it sold on the iTune Stores). A valid copyright, together with any requisite notice and relevant chain-of-title formalities, would have enabled Apple Corps to also assert its own copyright in the original footage, both when applying the U.S. Copyright Office registrations described above and in its exploitations detailed above. Apple Corps did not do so.

the Documentary. Hunt accepted Sony/ATV's terms on April 22, 2010. Sony/ATV confirmed

its approval on September 2, 2010 in writing. The agreement was memorialized in writings

exchanged between the parties (the "Agreement"). At all relevant times, Sony/ATV led

Producers to believe that Sony/ATV owned all relevant copyrights and publishing rights in North

America for all of the Lennon-McCartney compositions performed in the Tape.

56.     In reliance on this agreement, resources were invested into the completion of the

Documentary and, later, for marketing and promotion.

57.     Unbeknownst to the Producers, Sony/ATV did not keep the Negotiations

confidential. Apple Corps was, in fact, in direct contact with Sony/ATV and communicated

with Sony/ATV about the Documentary. Sony/ATV kept Apple Corps informed of the

Negotiations and discussions between the Producers and Sony/ATV.

58.     The Producers learned, through an admission by Sony/ATV employee Karina

Masters, that Apple Corps and Sony/ATV had agreed that Apple Corps' approval of a project

would be a precondition to any Sony/ATV license for The Beatles catalogue where a project

involved certain visual and/or vocal elements. Indeed, Sony/ATV's London-based Solicitor,

Andrew Malcolm Forbes, admitted that Apple Corps exercised considerable control over

Sony/ATV's licensing decisions with respect to the Songs in the Tape.

59.     On September 28, 2010, Sony/ATV learned that Apple Corps was planning to

release a film of the D.C. Concert in some form. Thereafter, motivated by its business

relationship with Apple Corps, and contrary to the terms of the Agreement previously reached

with the Producers, Sony/ATV granted an exclusive "synchronization" license to Apple Corps

in order to, upon information and belief, provide Apple Corps with a means to threaten to

block exhibition of the Documentary. The license purportedly granted Apple Corps the right

to match any offer for synchronization rights as to a product utilizing footage of the D.C. Concert and would bind Sony/ATV to grant such rights exclusively to Apple Corps if the latter matched the offer.

60.     Exclusive synchronization rights are highly unusual in the industry; given the nature of synchronization rights, it is generally not economically or strategically rational to grant exclusive rights to one party.  Nevertheless, Sony/ATV granted such an exclusive synchronization license to Apple Corps, despite the Agreement reached earlier with Hunt.

61.     In October 2010, Apple Corps wrote to the Producers' attorney, threatening the Producers with infringement of "performers' rights," even though the Tape is a legally published, authorized recording of the D.C. Concert.

62.     In November 2010, Sony/ATV refused to honor the Agreement with Hunt and the Producers and threatened to sue the Producers if they refused to agree not to commercially exploit the Tape.  Sony/ATV did this despite the fact that it asserted copyright in the eight Songs but had never substantiated the same and never claimed any copyright in the Tape or performances.

63.     Apple Corps CEO Jeff Jones told one of the Producers that Apple Corps could prevent exploitation of the Tape by telling right-holders-like *Sony*/ATV-to withhold their rights.

64.     On or about November 16, 2010, Apple announced the iTunes distribution of *The Beatles* recording and that it would include a DVD of the Washington, D.C. concert in the boxed set of a new compilation of *The Beatles* songs.  Apple falsely announced in a press release that its concert tape was "exclusive."  Plaintiff believes that Apple chose the Washington, D.C.

concert as a bonus in order to interfere and/or pre-empt a favorable public reception of the Documentary.

65.     Rakesh Sanghvi ("Sanghvi"), Managing Director of Sony/ATV in the United Kingdom, told Hunt that *Sony/ATV* withdrew from the Agreement at Apple Corps' request.

66.     Brodsky told one of the Producers that *Sony/ATV* wanted to perform the Agreement but that *Sony/ATV* had to inform Apple Corps and allow Apple Corps the right to approve what Sony/ATV had given to the Producers.

67.     The Producers subsequently conducted exhaustive research regarding any potential copyright in the Tape that would have prevented its inclusion in the Documentary for exhibition in the United States. Such research revealed that the Tape and the performances of The Songs were freely available for use in connection with the exploitation of the Tape through commercial exhibitions in the USA and that in any event, the fair use doctrine would provide a valid defense to any claim of copyright infringement.

68.     Ace and Producers were in possession of the two legal opinions, including one from Peter Jaszi, a Professor of Law at American University, that opined that commercial exhibition of the Documentary in the USA would not infringe any copyrights on the Songs or the Tape nor any other rights of Apple or Sony/ATV. Those opinions had persuaded Ace's insurers to issue errors and omissions coverage for any infringement liability of Ace.

69.     On or about March 16, 2012, Screenvision and Ace entered into the Second Amendment, which was the contract for nationwide distribution of the Documentary.

70.     Hunt contacted Sanghvi on March 16, 2012 to inform him of the planned exhibition in late spring in the USA by Ace. After that call, Hunt offered Sony/ATV an *ex gratia* payment, even though a license was unnecessary, in order to avoid any potential threat

16

of meritless infringement litigation. On March 18, 2013, Hunt followed up with an email. Sanghvi did not respond for over a month

71.     Defendant Apple was at the time planning a re-release of the feature film "Yellow Submarine." Upon information and belief, Apple had been planning a theatrical re-release of a restored and digitally re-mastered version of "Yellow Submarine" (a Beatle feature length animated film) and a soundtrack recording. Apple's Ziegfeld premiere of "Yellow Submarine" was scheduled for Saturday, May 5, 2013. Plaintiff's Ziegfeld premiere was scheduled for Sunday, May 6, 2013. Apple and Sony/ATV knew that the planned nationwide theatrical release of Yellow Submarine was scheduled for late May 2012 with release of the soundtrack and DVD and Blu-ray release at the same time. Apple and Sony/ATV were working with "alternative content" distributor "D and E Entertainment," a competitor of Screenvision in the alternative content theatrical exhibition business.

72.     In late April 2012, Sony/ATV refused Hunt's offer and indicated it would take legal action to prohibit exhibition of the Documentary.

73.     Despite the publicity preceding the Documentary premiere, none of the holders of the copyrights of other compositions performed by *The Beatles* (not associated with Apple or Sony) which were included on the Tape protested or asserted any right with respect to the performances of their copyrighted works in the Tape.

74.     Eventually English counsel for Sony/ATV sent a letter to Iambic and WPMC threatening to enjoin exhibition of the Documentary even though Sony/ATV knew that it was Ace which had exhibition rights and had contracted with Screenvision. No similar letter was sent to Ace.

75.     Defendants' representatives were informed well prior to seeking an injunction in London that there were no present plans or intentions to show the Documentary in the United Kingdom.  Moreover Sony/ATV representatives were advised that they would be given adequate notice before any plans for a United Kingdom exhibition were put in motion.

76.     On or before May 4, 2012, representatives of Sony/ATV and Screenvision were in communication, and in that communication Sony/ATV directly or indirectly, expressly or impliedly, represented that the exhibition of the Documentary would violate rights owned by Sony/ATV or Apple and that such an exhibition could not occur without agreement of Sony/ATV and Apple.

77.     On May 2, 2012, Sony/ATV and Sony/ATV Music Publishing (UK) Limited sought an injunction against Iambic and WPML Ltd. in London (the "London Proceeding"), alleging that Sony/ATV's copyright in the Songs was sufficient to allow the court to grant its application to enjoin the exhibition of the Documentary.  At the time of the filing of the injunction proceeding, Sony/ATV knew that (i) Ace had distribution rights to the Documentary; (ii) Ace and Screenvision had a contract to exhibit the Documentary nationwide to which none of Apple, Iambic or WPML were a party; (iii) no one intended, planned or discussed an exhibition of the Documentary outside the United States: (iv) neither Ace nor Screenvision could be, or were planned to be, joined in the UK proceeding; and (v) neither Sony/ATV nor Apple had any intention of seeking an injunction in any U.S. court.  The London proceeding was a calculated move to intimidate Screenvision and interfere with the Distribution Contract.

78.     By at least May 3, 2013, the Documentary was scheduled to be presented in 470 locations.  By that date, Screenvision, with Ace' permission, had also been in discussions with AMC, Cinemark and other distributors who were interested in showing the Documentary,

18

potentially adding an additional 500 theaters to the distribution portfolio as well as extending the planned 2-day exhibition into a 2 week initial run.

79.     The London Proceeding was accompanied by communications to Screenvision, demanding that they not exhibit the Documentary and causing them to pull the showings. The participating exhibiting theaters received this news and ceased selling tickets to Documentary screenings.

80.     After being informed of the London Proceeding, Screenvision told Ace that it would not authorize the exhibition of the Documentary without written confirmation from Sony/ATV that Ace had the right to use the Songs in the Documentary.

81.     The owner/operator of the Ziegfeld Theater decided that it would not proceed with the screening.

82.     When Ace could not provide such written license, Screenvision cancelled the Ziegfeld premiere.

83.     On Tuesday May 16, 2012 the parties to the UK proceeding entered into a mutual undertaking which was reduced to an Order (*See* Exhibit F annexed hereto).

84.     The UK Proceeding and Order resulting therefrom are not binding in the United States on all significant elements in several regards:

> (a) The sole decretal provision of the Order makes no order, it reads as follows:
>
>> IT IS ORDERED BY CONSENT THAT there shall be no order on the application, save that the costs of the application . . . be reserved to the trial of this action.
>
> (b) Ace Arts, Ltd. was not made a party to the Order;
>
> (c) the "undertakings" in the Order are not made by or on behalf of Ace Arts;

19

    (d) Ace Arts, Ltd. was not a party to the litigation;

    (e) Apple (despite its presence in the U.K.) did not join the action to assert any rights of trademark, trade dress or performance right with respect to the Concert Footage or the Documentary;

    (f) Sony/ATV does not claim any rights in the "Concert Footage";

    (g) Sony/ATV did not claim that any performance rights would be, or had been, infringed by creation or exhibition of any portion of the Concert Footage;

    (h) the Order has no provision for limiting choice of venue or forum for any other proceeding by the parties thereto;

    (i) Had the Order been intended to bind Ace or Screenvision it would have so stated; and

    (j) At the time they signed the undertakings, the Producers were under economic duress and were led by Sony/ATV to the believe that Sony/ATV had all the rights it was representing it had, even though Producers did not believe that these rights gave Sony/ATV the right to block the USA distribution or interfere with Ace's contract with Screenvision.

85.    In its sworn "Particulars of Claims", Sony/ATV stated the rights asserted by it were in the compositions: (a) She Loves You; (b) All My Loving; (c) I Wanna Hold Your Hand; (d) This Boy; (e) From Me To You; (f) I Saw Her Standing There; (g) I Wanna Be Your Man; and (h)Twist & Shout (66.66% share of copyright). *See* Exhibit G.

86.    Sony/ATV provided no substantiation of its present copyright or publishing rights in North America for any of the foregoing compositions.

87.     The Defendants denied all charging allegations and denied all control or authority

over Ace. *See* Exhibit I.

88.     Sony/ATV's baseless lawsuit had its intended effect, which was to interfere

with Ace's Distribution Contract with Screenvision and the exhibition of the Documentary.

## FIRST CAUSE OF ACTION

### AGAINST DEFENDANTS FOR
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT

89.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 88 as if set

forth fully herein.

90.     Beginning no later than 2010, Defendants Apple Corps and Sony/ATV

conspired and acted jointly to unreasonably restrain trade by keeping the Documentary off of

the market. Their actions occurred in and substantially affected interstate and foreign

commerce, and their conduct has injured the Plaintiff in violation of Section 1 of the Sherman

Act, 15 U.S.C. § 1.

91.     The concerted action engaged in by Defendants in their efforts to restrain trade

and competition occurred in and/or affected interstate or foreign commerce. Specifically,

Defendants' unlawful actions prevented Plaintiff from exhibiting the Documentary in theaters

across the United States. Additionally, Apple Corps' product incorporating the Tape was sold

via the iTunes Store to consumers throughout the United States, and Sony/ATV licenses its

music throughout the United States.

92.     Defendants' conspiracy is anti-competitive and illegal *per se* under Section 1 of

the Sherman Act.

93.     Alternatively, Defendants' unlawful conspiracy unreasonably restrains competition in the relevant market and violates Section 1 under the rule of reason.

94.     There is no legitimate, procompetitive business justification for Defendants that outweighs the harmful effect thereof.

95.     To the extent Plaintiff is legally required to prove monopoly power circumstantially by first defining a relevant product market, Plaintiff alleges that the relevant market is *Beatles*-related historical audio-visual media.

96.     The relevant geographic market is the United States and its territories.

97.     Plaintiff suffered substantial injury in its business and property as a direct and proximate result of Sony/ATV's and Apple Corps' conduct.

98.     Accordingly, Plaintiff seeks actual damages and treble damages against Defendants, an award of attorneys' fees and costs of suit, and injunctive relief to remedy Defendants' unlawful conduct (including, but not limited to, an Order enjoining Defendants from claiming a right to prohibit the exhibition of the Documentary and mandating the retraction of prior statements concerning such an alleged right).

## SECOND CAUSE OF ACTION

## FOR DECLARATORY RELIEF

99.     Plaintiff repeats and realleges the allegations of paragraphs 1-98 as if fully set forth herein.

100.    Sony/ATV has asserted rights in eight of the compositions in the Tape. Through the acts described herein, Sony/ATV has engaged in an unlawful campaign to extend the scope of any such rights under the copyright laws.

101.    Plaintiff can incorporate the Tape (including the Songs performed therein) into

22

the Documentary, without any license from Sony/ATV, because unprotected, unchallenged publications of the Tape have carried the underlying compositions into the public domain.

102.    Plaintiff can also incorporate the Tape (including the Songs performed therein) into the Documentary because Plaintiff's use of the Tape in the Documentary constitutes a "fair use" under 17 U.S.C. § 107.

103.    Sony/ATV's actions in leveraging its copyrights on the Songs in order to suppress the distribution and exhibition of the Documentary constitute copyright misuse.

104.    Sony/ATV's copyright misuse has injured Plaintiff and prevented Plaintiff's exploitation of the Documentary, its own original derivative work.

105.    Plaintiff's attempts to exhibit and exploit the Documentary in the United States have brought Plaintiff into adversarial conflict with Sony/ATV and Apple Corps.

106.    Alleging copyright infringement, Sony/ATV initiated the London Proceeding against the Producers to prevent the exhibition of the Documentary.

107.    Representatives of Sony/ATV directly or indirectly, expressly or impliedly, also represented to Screenvision that the exhibition of the Documentary would violate rights owed by Sony/ATV or Apple Corps and that such an exhibition cold not occur without agreement of Sony/ATV and/or Apple Corps.

108.    By leveraging its copyrights in the Songs in order to suppress the distribution and exhibition of the Documentary, Defendants created in Plaintiff, Screenvision, and the participating exhibiting theaters a real and reasonable apprehension of liability.

109.    Following Sony/ATV's communications with Screenvision and based on Sony/ATV's express or implied threat of infringement litigation, Screenvision refused and continues to refuse to perform under the Distribution Contract.

23

110.   The theaters participating in the Documentary's exhibition, including the Ziegfeld Theater, also became aware of Sony/ATV's communications and litigation and ceased selling tickets to screening of the Documentary.

111.   Any further attempt by Plaintiff to exhibit the Documentary carries with it a serious risk of an infringement suit brought by Defendants and more subsequent interference.

112.   This controversy has injured Plaintiff and prevents Plaintiff's exploitation of the Documentary, its own original work.

113.   A judgment declared by this Court as to whether Plaintiff's exploitation of the Documentary infringes Sony/ATV's copyrights would not only afford relief from the uncertainty and insecurity Plaintiff faces as the result of this controversy, but it would serve the useful purpose of clarifying and settling the legal issues surrounding this controversy.

114.   An actual controversy between the parties exists at this time as to whether Sony/ATV's copyrights on the Songs allow it to prohibit Plaintiff's exhibition and distribution of the Documentary.

115.   Unless the Court resolves this matter, Sony/ATV's tactics will continue to harm Plaintiff by disrupting its exhibition of the Documentary.

116.   Accordingly, Plaintiff is entitled to and seeks a declaratory judgment establishing (a) that neither Sony/ATV nor Apple Corps have any rights which would be infringed by commercial exploitation of the Documentary in the USA; (b) Sony/ATV has misused its copyrights on the Songs and that based upon such misuse by Sony/ATV, neither the Documentary nor Plaintiff's exhibition thereof infringes any of Sony/ATV's alleged copyrights; and (c) that the Documentary's use of the Tape and the Songs and performances therein constitutes "Fair Use" and does not therefore constitute a violation or infringement of any

copyrights to the Songs.

117.    Plaintiff seeks a further declaratory judgment establishing that the unprotected, unchallenged publications of the Tape under the circumstances described herein have carried the Songs into the public domain.

### THIRD CAUSE OF ACTION

### AGAINST DEFENDANTS FOR
### TORTIOUS INTERFERENCE WITH CONTRACT

118.    Plaintiff repeats and realleges the allegations of paragraphs 1-117 as if fully set forth herein.

119.    Defendants-motivated by their desire to preclude any competition to Apple Corps' film on iTunes, prevent Plaintiff from gaining any prominence or prestige in any Beatles-related audio-visual media, and control all *The Beatles*-related audio-visual media in the marketplace-intentionally interfered with the Distribution Contract between Ace and Screenvision, without privilege or justification, through conduct specifically designed to induce a breach or otherwise disrupt their contractual relationship.

120.    The Distribution Contract is valid, enforceable, and fully executed. Screenvision has always been ready, willing, and able to perform the Distribution Contract and would have done so but for Defendants' interference.

121.    Under the Distribution Contract, the Documentary was scheduled to premiere with two shows at the Ziegfeld Theater on May 6, 2012, followed by showings in movie theaters across the United States on May 17 and May 22. Tickets were available on Ticketmaster.com, Fandango.com, movietickets.com, and moviefone.com.

122.    Media attention for the premiere of the Documentary was enormous. Articles

25

appeared on deadline.com, huffingtonpost.com, variety.com, examiner.com, drafthouse.com, perezhilton.com, Chicago o r suntimes.com, bbc.co.uk, and Associated Press, among others. Plaintiff reasonably anticipated earning profits and gaining invaluable prestige, exposure, publicity, and market awareness for the Documentary.

123.     Defendants knew of the Distribution Contract and its basic terms significantly in advance of the scheduled premiere.  In conspiracy with and at the insistence of Apple Corps, Sony/ATV communicated directly with Screenvision on May 3, 2012 - just days before the scheduled Ziegfeld premiere - falsely stating to Screenvision that the Documentary infringed on Sony/ATV's copyrights and demanding that Screenvision not exhibit the Documentary. These communications were intentionally designed to, and did in fact, induce a breach and disruption of the Distribution Contract.

124.     That same day, Screenvision informed Ace that Screenvision would not authorize the Ziegfeld premiere unless Ace provided written confirmation from Sony/ATV, by close of business on May 4, 2012, that Ace had the rights to use the songs in the Documentary.

125.     When Ace could not provide such written confirmation, Screenvision cancelled the Ziegfeld premiere.

126.     Screenvision subsequently made a demand to Plaintiff for restitution of all costs for marketing, public relations, and losses of its own and those of participating theater owners.

127.     As a result of the Defendants' interference with the Distribution Contract, Plaintiff has sustained and suffered loss and damages.

128.     Defendants have obtained commercial benefit through the use of the unlawful conduct described herein, including, for example, by unfairly eliminating competition in the

market for *The Beatles*-related audio-visual media sold by Defendants.

129.    Defendants have received such commercial benefit, fees, and other monies and consideration at the expense of Plaintiff.

130.    The amount of such benefits, monies, fees, or consideration due Plaintiff from Defendants cannot be ascertained without an accounting of the income and gross profits that Defendants obtained through their wrongful conduct. Plaintiff is entitled, therefore, to an accounting, compensatory damages, and punitive damages.

## FOURTH CAUSE OF ACTION

### AGAINST DEFENDANT SONY/ATV FOR
### INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

131.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 130 as if set forth fully herein.

132.    Defendants-motivated by their desire to preclude any competition to Apple Corps' film on iTunes, prevent Plaintiff from gaining any prominence or prestige in any Beatles-related audio-visual media, and control all *The Beatles*-related audio-visual media in the marketplace-intentionally interfered with the prospective economic relations between Plaintiff and third parties, without privilege or justification, through conduct specifically designed to interfere with or disrupt such economic relationships.

133.    Plaintiff engaged in business discussions and exchanged information with potential third-party distributors and exhibitors of the Documentary *(e.g.,* Screenvision, o t h e r U.S. movie theaters chains, two American television networks, and two DVD labels), which resulted in economic relationships with a probable future of economic benefit or advantage to Plaintiff through theatrical and post-theatrical exhibition of the Documentary.

134.     Defendants knew of Plaintiff's prospective economic relations.  In conspiracy with and at the insistence of Apple Corps, Sony/ATV intentionally conveyed false information to Screenvision and the Ziegfeld Theater regarding the copyright status of the Documentary and demanded that they not exhibit the Documentary.  Defendants' purpose was to disrupt Plaintiff's relationship with Screenvision, the Ziegfeld Theater, and other distributors and exhibitors of the Documentary.

135.     Screenvision informed Ace that it would not authorize the Ziegfeld premiere unless Ace provided written confirmation from Sony/ATV, by close of business on May 4, 2012, that Ace had the rights to use the Songs in the Documentary.  Screenvision also indicated that it would not exhibit the Documentary in *any* theater if the dispute was not resolved it its satisfaction.

136.     When Ace could not provide such written confirmation, Screenvision cancelled the Ziegfeld premiere.

137.     Screenvision indicated that it "hope[d] the issues w[ould] be resolved in short order so the attraction c[ould] be rescheduled for an even larger theatrical run in late Summer *2012."*

138.     To date, Plaintiff has been unable to exhibit the Documentary due to Defendants' conduct.

139.     As a result of Defendants' conduct, Plaintiff has suffered ascertainable loss and damage.

140.     Defendants' interference with Plaintiff's prospective economic relations also constitutes a violation of Section 1 of the Sherman Act, as fully alleged in Plaintiff's First Cause of Action.  Thus, Defendants' conduct is independently wrongful.

141.   As a result of Defendants' conduct, Plaintiff has suffered damages and is entitled to compensatory, and punitive damages.

## FIFTH CAUSE OF ACTION

### AGAINST DEFENDANTS
### UNFAIR COMPETITION UNDER NEW YORK COMMON LAW

142.   Plaintiff repeats and realleges the allegations of paragraphs 1 through 141 as if set forth fully herein.

143.   Defendants-motivated by their desire to preclude any competition to Apple Corps' film on iTunes, prevent competition for the remastered premiere of "Yellow Submarine" in May 2012, prevent Plaintiff from gaining any prominence or prestige in any Beatles-related audio-visual media, and control all *The Beatles*-related audio-visual media in the marketplace, thus engaged in unfair competition by (i) communicating untrue statements designed to injure Plaintiff; (ii) commencing baseless litigation, the true purpose of which was to cause distributors and exhibitors of the Documentary to refuse to deal with Plaintiff; and (iii) engaging in concerted actions constituting illegal anticompetitive conduct.

144.   In conspiracy with and at the insistence of Apple Corps, Sony/ATV communicated false information to Screenvision and the Ziegfeld Theater; namely, that Ace could not exhibit the Documentary without infringing Sony/ATV's copyrights in the Songs.

145.   As a result of Defendants' conduct and dishonesty, Screenvision breached the Distribution Contract, the Documentary's exhibition was cancelled, and prospective theatrical and post-theatrical distribution agreements collapsed. Accordingly, Plaintiff suffered significant economic damage.

146.   The value of rolling out and presenting the Documentary in theaters and

derivative marketing channels was reasonably projected to be in the hundreds of millions of dollars.

147.    Defendants have obtained commercial benefit through the use of the unlawful conduct described herein, including, for example, by unfairly eliminating competition in the market for *The Beatles*-related audio-visual media.

148.    Defendants have received such commercial benefit, fees, and other monies and consideration at the expense of Plaintiff.

149.    The amount of such benefits, monies, fees, or consideration due Plaintiff from Defendants cannot be ascertained without an accounting of the income and gross profits that Defendants have obtained through their wrongful conduct. Plaintiff is entitled, therefore, to an accounting and disgorgement, punitive and compensatory damages.

**SIXTH CAUSE OF ACTION**

**AGAINST DEFENDANT SONY/ATV FOR
VIOLATION OF SECTION 349, NEW YORK GBL**

150.    Plaintiff repeats and realleges each and every allegation of the Complaint as if more fully set forth herein.

151.    NY General Business Law § 349(a) states:

> Deceptive acts or practices in the conduct of any business, trade or commerce or in furnishing of any service in this state are hereby declared unlawful.

152.    Defendant Sony/ATV in communicating with SV made false and/or misleading statements regarding plaintiff's legal rights to have the Documentary exhibited without a license or permission from Sony/ATV and/or Apple and made false and/or misleading statements or

30

omissions, concerning Sony/ATV's and/or Apple's copyright, publishing rights and/or performing rights of the Songs in North America.

153.    SV made the statement to prevent the New York State (and United States) consumers from seeing the screening of the Documentary.

154.    Sony/ATV's actions were intended to and did affect consumers who had already purchased tickets to the screening.

155.    At the time of Sony/ATV's wrongful conduct, Ace was competing with Sony/ATV and Apple for ticket buyers because of the overlapping exhibition schedules of remastered "Yellow Submarine" and the Documentary.

156.    Sony/ATV's misrepresentations were material.

157.    Plaintiff was injured by Sony/ATV's acts and suffered loss and damage as a result thereof.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays judgment against Defendants jointly and severally as stated and for such other and further relief in this Court's discretion as it deems just and proper, including:

i.    Actual and compensatory damages in the sum of at least $100,000,000 and, where applicable under each of Plaintiff's claims for monetary relief, treble, multiple, punitive, and/or other damages, in an amount to be determined at trial, including interest;

ii.    A declaration of judgment as follows:  establishing (a) that neither Sony/ATV nor Apple have any rights which would be infringed by commercial exploitation of the Documentary in the USA; (b) Sony/ATV has misused its copyrights

on the Songs and that based upon such misuse by Sony/ATV, neither the Documentary nor Plaintiff's exhibition thereof infringes any of Sony/ATV's alleged copyrights; and (c) that the Documentary's use of the Tape and the Songs and performances therein constitutes "Fair Use" and does not therefore constitute a violation or infringement of any copyrights to the Songs.

        iii.     An accounting and disgorgement of profits;

        iv.     Injunctive and declaratory relief;

        v.     Costs of suit, including attorneys' fees; and

        vi.     Such further and additional relief may be required and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all claims so triable for which a jury trial is authorized.

Dated: October 11, 2013

                      SQUITIERI & FEARON, LLP

                      By:_____
                        Lee Squitieri
                      lee@sfclasslaw.com
                      Caitlin Duffy
                      caitlin@sfclasslaw.com
                      32 East 57th Street
                      12th Floor
                      New York, New York 10022
                      Telephone:  (212) 421-6492
                      Facsimile:  (212) 421-6553

WEXLER WALLACE LLP
Kenneth A. Wexler
Bethany R. Truke
Catherine C. Howlett
kaw@wexlerwallace.com
brt@wexlerwallace.com
ch@wexlerwallace.com
55 West Monroe Street, Suite 3300
Chicago, Illinois 60603
Telephone:  (312) 346-2222
Facsimile:  (312) 346-0022

Attorneys for the Plaintiff