UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: SEP 2 6 2014

---

Ace Arts, LLC,

                    Plaintiff,

        —v—

Sony/ATV Music Publishing, LLC, et al.,

                    Defendants.

---

13-cv-7307 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

        This action arises from the use of eight Beatles songs in the documentary film *The Beatles: The Lost Concert* ("*The Lost Concert*"). Specifically, Plaintiff Ace Arts, LLC ("Ace") alleges that Defendants Sony/ATV Music Publishing, LLC ("SATV") and Apple Corps Limited ("Apple") unlawfully interfered with the United States distribution of *The Lost Concert* by asserting copyright claims regarding those songs. Defendants have moved to dismiss or stay this case in deference to an action previously filed in the United Kingdom, and to dismiss the amended complaint for failure to state a claim pursuant to Rule 12(b)(6). Dkt. Nos. 41, 45. For the reasons that follow, the motion to dismiss or stay the case in deference to the United Kingdom action is denied, and the motion to dismiss for failure to state a claim is granted in part and denied in part.

## I.      Legal Standard

        "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In

determining whether this standard has been met, " a court must accept as true all well-pleaded facts and draw all reasonable inferences in the light most favorable to the non-moving party." *Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics, GmbH*, No. 14-cv-585 (AJN), 2014 WL 2526965, at *1 (S.D.N.Y. June 3, 2014) (citing *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 228, 237 (2d Cir. 2007)). This presumption of truth is not, however, accorded to a legal conclusion that is merely "couched as a factual allegation" in the complaint. *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (quoted in *Twombly*, 550 U.S. at 555).

In this context, "[d]ocuments that are attached to the complaint or incorporated in it by reference" are "deemed part of the pleading and may be considered" in deciding the motion. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). In addition, certain documents outside the complaint, including judicially noticeable documents such as federal copyright registrations, *see Island Software & Computer Serv. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005), may be considered on a motion to dismiss for the limited purpose of "determin[ing] *what* the documents state[]," *Roth*, 489 F.3d at 509 (emphasis in original). For example, in *Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406 (2d Cir. 2008), the Second Circuit approved of the district court's consideration of judicially noticeable publications and court documents "to show that certain things were said in the press, and that assertions were made in lawsuits and regulatory filings." *Id.* at 425. However, such documents may not be used to "*prove the truth of their contents*," *Roth*, 489 F.3d at 509, and it is inappropriate to discredit the factual allegations of a complaint merely because they are contradicted by assertions made in judicially noticeable documents, *see id.* at 511 (finding that it was improper for the district court to discredit allegation that defendants acted in concert based on judicially noticeable assertion that they were not a "group"); *see also Chechele v. Scheetz*, 466 F. App'x 39, 40-41 (2d Cir. 2012) (affirming district

court's refusal "to consider certain SEC filings, which were not incorporated into the complaint, for the truth of their assertions"). As the Second Circuit has emphasized, "a ruling on a motion for dismissal pursuant to Rule 12(b)(6) is not an occasion for the court to make findings of fact." *Roth*, 489 F.3d at 509.

## II.    Background

As set forth above, the following facts are taken from the Amended Complaint ("Am. Compl.") and the documents attached to it, and they are assumed true for purposes of deciding this motion. *See Roth*, 489 F.3d at 509. In addition, the Court takes judicial notice of the existence of certain documents and statements raised by Defendants, *see* Dkt. No. 33, but does not consider them for the truth of the matters asserted. *Roth*, 489 F.3d at 509.

The first live public performance by the Beatles in the United States took place at the Coliseum in Washington, D.C. on February 11, 1964, and was preserved on a two-inch standard American "quad" videotape ("Tape") by the National General Corporation. Am. Compl. ¶¶ 18-19. The Court takes judicial notice of the fact that, of the twelve songs played at the concert, Am. Compl. ¶¶ 18-19, 49, Defendant Sony/ATV ("SATV") has filed Copyright Registrations with the U.S. Copyright Office for the following eight: (1) "She Loves You"; (2) "All My Loving"; (3) "I Wanna Hold Your Hand"; (4) "This Boy"; (5) "From Me to You"; (6) "I Saw Her Standing There"; (7) "I Wanna Be Your Man"; and (8) "Twist and Shout" (collectively, "Songs"). *See* Buckley Decl., Ex. J. However, the Amended Complaint alleges that, since 2011, Round Hill Music and Adage Classics have owned the North American copyright and publishing rights to "She Loves You," "I Saw Her Standing There," "From Me to You," and "I Wanna Be Your Man." Am. Compl. ¶ 49.[1]

---

[1] Defendants seek to contradict this factual allegation by requesting that the Court take judicial notice of certain sublicensing agreements between SATV and an entity alleged to be Roundhill's predecessor. *See* Dkt. No. 33, at 9.

After the live performance, the Tape was screened via a closed-circuit telephone network to an audience of approximately 500,000 in March 1964. Am. Compl. ¶ 23. Ownership of the Tape was transferred twice without copyright notice: first to Malcolm Klein in the early 1970's, and then to James Karnbach in 1987. *See* Am. Compl. ¶¶ 27-31. In addition, footage from the Tape was "commercially exploited" several times between 1964 and 2010, including in the 1991 motion picture *The Beatles: The First US Visit*, which Apple released in 1998. *See id.* ¶¶ 32-39.

In 2009, the Tape was acquired by production company WPMC Limited ("WPMC"). Am. Compl. ¶ 41. WPMC and Iambic Media Ltd. ("Iambic" and, collectively with WPMC, "Producers") used the Tape to produce *The Beatles: The Lost Concert* ("*The Lost Concert*"), which "consists of the entire D.C. Concert footage, fully digitally remastered, and newly original filmed sequences, including contemporary interviews with individuals and celebrities connected to the D.C. Concert as well as expert commentary on the cultural significance of the event." *Id.* ¶¶ 41-44. Iambic is a production company founded by Chris J. Hunt. *Id.* ¶ 42. Ace, the Plaintiff here, was granted distribution rights to *The Lost Concert* by the Producers.[2] *Id.* ¶ 41.

In or about 2009, the Producers approached SATV about using the Songs in *The Lost Concert*, believing at the time that SATV "owned all applicable copyright and publishing rights to the Songs," Am. Compl. ¶¶ 53-54, including the "so-called synchronization right, or . . . right to reproduce the music onto the soundtrack of a film or videotape in synchronization with the action," *Freeplay Music, Inc. v. Cox Radio, Inc.*, 404 F. Supp. 2d 548, 551 (S.D.N.Y. 2005) (quoting *Buffalo Broad. Co., Inc. v. Am. Soc'y of Composers, Authors & Publishers*, 744 F.2d

---

However, the mere *existence* of the sublicense agreements—which is all that the Court can properly consider on this procedural posture, *see Roth*, 489 F.3d at 511—does not show that Plaintiff's allegation is false, and so the Court does not consider it.

[2] Defendants assert that Chris Hunt controls Ace as well as WPMC and Iambic, and request that the Court take judicial notice of this fact by introducing evidence from Ace's website. *See* Dkt. No. 33; Buckley Decl., Ex. A (webpage stating that Chris Hunt is Ace's CEO). Even taking judicial notice of the website, however, the Court can consider this statement only for its existence, and not for its truth. *See Roth*, 489 F.3d at 511.

917, 920 (2d Cir. 1984)).  Mr. Hunt was involved in these discussions and accepted SATV's

April 22, 2010, offer of a synchronization license to use the Songs in *The Lost Concert* on behalf

of the Producers.  *Id.* ¶ 55.  The Producers believed these negotiations to be confidential, but

later learned that they had been disclosed to Apple by SATV.  *Id.* ¶¶ 54-57.  The Complaint

alleges that, at Apple's request, SATV refused to honor the agreement to grant the Producers a

synchronization license and instead granted Apple an exclusive synchronization license.  *Id.*

¶¶ 59, 60-62, 65-66.  On November 16, 2010, Apple announced that it would be distributing a

new compilation of Beatles songs—including footage from the Tape—on iTunes.  *Id.* ¶ 64.  At

around the same time, both Apple and SATV contacted the Producers to assert that use of the

Tape in *The Lost Concert* would infringe SATV's copyright and Apple's exclusive

synchronization license.  *Id.* ¶¶ 61-63.

Despite the ongoing conflict with Apple and SATV, the Producers' own research led

them to believe that there was no legal obstacle to distributing the film in the United States.  *See*

Am. Compl. ¶¶ 67-68.  Based upon this research, Ace secured errors and omissions coverage for

any infringement liability from its insurers and entered into a March 2012 agreement with

Screenvision to distribute the film in the United States, *see id.* ¶¶ 68-69, Ex. A ("Distribution

Agreement"), pursuant to which a May 6, 2012, premiere at the Ziegfeld Theater in New York

was planned, *id.* ¶ 71.  Meanwhile, Apple prepared for its own United States Beatles-related film

premiere, scheduling the re-rerelease of "Yellow Submarine" at the Ziegfeld on May 5, 2012.

*Id.*

On March 16, 2012, Mr. Hunt contacted SATV to inform them of the planned United

States distribution of the film, and to offer SATV a payment to avoid infringement litigation,

although Mr. Hunt believed such litigation would be meritless.  Am. Compl. ¶ 70.  In April,

SATV refused the offer and indicated that it would take legal action. *Id.* ¶ 72. Soon thereafter, United Kingdom-based counsel for SATV sent a letter to the Producers indicating that it would seek to enjoin exhibition of the film. *Id.* ¶ 74. Ace received no similar letter, although SATV was aware that Ace was the intended United States distributor, and that no United Kingdom distribution of the film was being planned. *Id.* ¶¶ 74-75.

On May 2, 2012, SATV and its United Kingdom affiliate sought an injunction against the Producers in London ("UK Action"), alleging that exhibition of *The Lost Concert* would infringe SATV's copyrights. Am. Compl. ¶ 77. Shortly thereafter, SATV contacted Screenvision— Ace's United States distribution partner—to assert that exhibition of *The Lost Concert* would violate rights owned by SATV and Apple, and to demand that no exhibition of the film occur. *See* Am. Compl. ¶¶ 76, 80. In response, Screenvision requested from Ace written confirmation of Ace's right to use the Songs in the film. *Id.* ¶ 81. Due to Ace's inability to provide such a written license, Screenvision cancelled the premiere. *Id.* ¶ 83. On May 16, 2012, Mr. Hunt, on behalf of the Producers, and SATV entered a consent order enjoining Ace from distributing *The Lost Concert* in the United States "pursuant to Ace's agreement with [Screenvision] or otherwise howsoever." Am. Compl., Ex. F. On June 11, 2012, SATV and its United Kingdom affiliate filed their Particulars of Claims with the high Court of Justice, Chancery Division, Intellectual Property, in the United Kingdom, Buckley Decl., Ex. D, and on June 12, 2012, the Producers filed a Defence, Buckley Decl., Ex. E.

Approximately one year later, on June 6, 2013, Ace filed a complaint against SATV and Apple in the Central District of California, based on the events surrounding the collapse of its United States distribution deal. *See* Buckley Decl., Ex. B. On August 5, 2013, Ace submitted a

notice of voluntarily dismissal, resulting in the dismissal of that case without prejudice. *See* Buckley Decl., Ex. C.

This action was filed on October 16, 2013. *See* Dkt. No. 1. The Amended Complaint seeks declaratory judgment establishing that: (1) "neither [SATV] nor [Apple] have any rights which would be infringed by the commercial exploitation of [*The Lost Concert*] in the USA"; (2) SATV "misused its copyright on the Songs"; (3) the use of the Tape and the Songs in *The Lost Concert* "constitutes 'Fair Use' and does not therefore constitute a violation or infringement of any copyrights to the songs," Am. Compl. ¶ 118, and (4) "the unprotected, unchallenged publications of the Tape . . . have carried the Songs into the public domain," Am. Compl. ¶ 119. In addition, Plaintiff brings a claim for violation of Section 1 of the Sherman Act, and state-law claims for interference with contract, interference with prospective economic relations, unfair competition, and violation of New York General Business Law § 349(a).

### III.   International Comity Abstention

The Court first addresses Defendants' request that this action be dismissed or stayed pending resolution of the UK Action. *See* SATV Mem. 7-11. For the following reasons, their request is denied.

"Generally, concurrent jurisdiction in United States courts and the courts of a foreign sovereign does not result in conflict," and such "[p]arallel proceedings in the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata the other." *Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92 (2d Cir. 2006). In exceptional circumstances, however, a district court may exercise its "inherent power to dismiss or stay an action based on the pendency of a related proceeding in a foreign jurisdiction." *Ole Media*

*Mgmt., L.P. v. EMI April Music, Inc.*, No. 12-cv-7249 (PAE), 2013 WL 2531277, at *2

(S.D.N.Y. June 10, 2013) (citing, *inter alia*, *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)).

When determining whether such an abstention is appropriate, "a district court should be guided

by the principles upon which international comity is based: the proper respect for litigation in

and the courts of a sovereign nation, fairness to litigants, and judicial efficiency." *Royal & Sun*

*Alliance*, 466 F.3d at 94. These principles in turn require evaluation of such factors as:

> [T]he similarity of the parties, the similarity of the issues, the order in which the
> actions were filed, the adequacy of the alternate forum, the potential prejudice to
> either party, the convenience of the parties, the connection between the litigation
> and the United States, and the connection between the litigation and the foreign
> jurisdiction."

*Id.* These factors are nonexclusive, and the court's ultimate determination should be based upon

the "totality of the circumstances." *Id.*

In making this determination, district courts must keep in mind that "[t]he mere existence

of parallel foreign proceedings does not negate [their] 'virtually unflagging obligation . . . to

exercise the jurisdiction given them.'" *Royal & Sun Alliance*, 466 F.3d at 92 (citing *Colorado*

*River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). Accordingly, a

district court should not abstain in deference to a previously filed foreign proceeding under

"circumstances that routinely exist in connection with parallel litigation," but should rather

reserve abstention for situations in which "additional circumstances . . . outweigh the district

court's general obligation to exercise its jurisdiction." *Id.* at 95; *see, e.g., Kitaru Innovations Inc.*

*v. Chandaria*, 698 F. Supp. 2d 386, 391 (S.D.N.Y. 2010) (refusing to abstain where the only

circumstances cited in support of the request were "commonly present when a parallel

proceeding is ongoing"). Thus, "[t]he task of the district court in evaluating a request for

dismissal based on a parallel foreign proceeding is not to articulate a justification *for* the exercise

of jurisdiction, but rather to determine whether exceptional circumstances exist that justify the

surrender of that jurisdiction." *Royal & Sun Alliance*, 466 F.3d at 93 (citing *Moses H. Cone*

*Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 25-26 (1983); *Colorado River*, 424 U.S. at

813).  Where the question is close, a temporary stay in proceedings may represent an appropriate

"lesser intrusion on the principle of obligatory jurisdiction" than dismissal or indefinite stay.  *Id.*

at 96.

      Having reviewed the totality of the circumstances, the Court finds that there are no

exceptional circumstances that justify abstention in this case, whether that abstention takes the

form of dismissal or a stay.  Assuming the allegations in the Amended Complaint to be true, it is

not apparent that the two cases are sufficiently parallel to warrant abstention, as they involve

only one common party and one common claim.  While the parties in the two actions need not be

exactly the same in order for them to be considered parallel, "they must be substantially the

same, litigating substantially the same issues in both actions." *Royal & Sun Alliance*, 466 F.3d at

94.  Although SATV may ultimately be able to prove that the relationship between Ace and the

Producers is such that any judgment in the UK Action will have preclusive effect on this action,

*see* SATV Mem. 9 n.9, those facts are not apparent from the pleadings, and a motion to dismiss

is "not an occasion for the court to make findings of fact," *Roth*, 489 F.3d at 509.  Moreover, it

does not appear that significantly more progress has been made in the UK Action than this one,

notwithstanding that the UK Action was filed over a year earlier.  *See* Am. Compl. ¶ 77.  Indeed,

nothing is alleged to have occurred in the UK Action subsequent to the July 12, 2012, filing of

the Producers' Defence, *see* Buckley Decl., Ex. E, and Defendants' limited assertion that the UK

Action is now "moving forward" following a stay pending the liquidation of Iambic, *see* SATV

Reply 4, does not otherwise persuade the Court that abstention would so advance judicial

efficiency as to present an exceptional circumstance weighing against the ordinary exercise of

jurisdiction. *Cf. Kitaru*, 698 F. Supp. 2d at 391 (rejecting request for abstention where "there [was] no evidence that the Canadian Action had progressed significantly during the thirty days that preceded the filing here, or that it [had] progressed significantly since that filing"). Under these circumstances, the Court will neither dismiss nor stay this case in favor of the UK Action.

## IV.    Declaratory Judgment

In the Amended Complaint, Plaintiff seeks a declaratory judgment establishing that: (1) "neither [SATV] nor [Apple] have any rights which would be infringed by the commercial exploitation of [*The Lost Concert*] in the USA"; (2) SATV "misused its copyright on the Songs"; (3) the use of the Tape and the Songs in *The Lost Concert* "constitutes 'Fair Use' and does not therefore constitute a violation or infringement of any copyrights to the songs," Am. Compl. ¶ 118, and (4) "the unprotected, unchallenged publications of the Tape . . . have carried the Songs into the public domain," Am. Compl. ¶ 119.  Apple contends that this request for declaratory judgment against it "[c]annot [l]ie" because Plaintiff "fails to plead facts sufficient to state a claim for declaratory relief."  Apple Mem. 18.

The Court disagrees.  Under the Declaratory Judgment Act, a federal court "may declare the rights and other legal relations of any interested party seeking such a declaration," provided that the case otherwise falls within the court's jurisdiction.  28 U.S.C. § 2201(a).  The Second Circuit has held that "a court *must* entertain a declaratory judgment action: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Continental Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992) (emphasis added).  In this case, Plaintiff alleges that SATV issued Apple an exclusive synchronization license to the Songs, Am. Compl. ¶ 59, and that Apple thereafter

10

asserted to Plaintiff, *id.* ¶ 61, and Screenvision, *id.* ¶ 109, that exhibition of *The Lost Concert* would infringe that exclusive license.  Under these circumstances, it is plausible that declaratory "judgment will serve a useful purpose in clarifying and settling the legal relations in issue," and, furthermore, "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Continental Cas. Co.*, 977 F.3d at 727.  The Court accordingly concludes that it must entertain the request for declaratory judgment, and therefore denies Apple's request to dismiss with respect to this claim.

## V.   Sherman Act

The Court turns to Plaintiff's claim brought under the Section 1 of the Sherman Act.  In particular, Plaintiff alleges that Defendants' conduct in "prevent[ing] Plaintiff from exhibiting [*The Lost Concert*] in theaters across the United States" was "illegal *per se* under Section 1 of the Sherman Act."  Am. Compl. ¶¶ 92-93.  In the alternative, Plaintiff alleges that Defendants' conduct "unreasonably restrains competition in the relevant market and violates Section 1 under the rule of reason." *Id.* ¶ 94.

Section 1 of the Sherman Act declares unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 1.  This language is not read literally, as such application "would outlaw the entire body of private contract law." *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 618 (S.D.N.Y. 2013) (quoting *Nat'l Soc'y of Prof'l Engineers v. United States*, 435 U.S. 679, 688 (1978)).  Rather, the Supreme Court has repeatedly held that § 1 'outlaw[s] only unreasonable restraints.'" *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)) (alteration in original).  Thus, in order to state a Section 1 violation, a plaintiff must

allege (1) the existence of "a combination or some form of concerted action between at least two

legally distinct economic entities," and (2) that "such combination or conduct constituted an

unreasonable restraint of trade either *per se* or under the rule of reason." *Tops Mkts., Inc. v.

Quality Mkts., Inc.*, 142 F.3d 90, 95-96 (2d Cir. 1998). The adequacy of the pleadings as to the

first prong do not appear to be contested here. Defendants do, however, argue that Plaintiff's

allegations fail to plausibly state that their conduct constituted either a *per se* violation or a

violation of the rule of reason, and they further contend that their conduct was privileged by the

Noerr-Pennington Doctrine. The Court addresses each of these arguments in turn.

### A. Per Se Liability

Because determining whether a restraint on trade is unreasonable in violation of Section 1

is typically a "laborious process," certain categories of "obviously unreasonable restraints" on

trade trigger *per se* liability under Section 1. *Intellective, Inc. v. Massachusetts Mut. Life Ins.

Co.*, 190 F. Supp. 2d 600, 615-16 (S.D.N.Y. 2002); *see also Leegin*, 551 U.S. at 886 ("Resort to

*per se* rules is confined to restraints . . . 'that would always or almost always tend to restrict

competition and decrease output.'") (quoting *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485

U.S. 717, 723 (1988)). Of particular relevance to this case, "agreements between competitors at

the same level of the market structure to allocate territories, fix prices or otherwise minimize

competition—referred to as 'horizontal restraints'—are classic examples of *per se* violations,"

while "agreements between persons at different levels of a market structure, for example

between manufacturer and distributor or between franchisor and franchisee—referred to as

'vertical restraints'—are analyzed under the rule of reason." *Integrated Sys. & Power, Inc. v.

Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 291 (S.D.N.Y. 2010) (citing *United States v. Topco

Assocs., Inc.*, 405 U.S. 596, 608 (1972); *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58-

59 (1977); *Leegin*, 551 U.S. at 907). Here, Plaintiff argues that it has adequately pled the existence of a horizontal agreement between competitors SATV and Apple. *See* Pl. Opp. 16. Defendants SATV and Apple, however, contend that Ace's allegations show them to have an "obviously vertical" relationship precluding statement of a claim for a *per se* violation. Apple Mem. 7.

As an initial matter, the Court rejects Ace's argument that its mere allegation that SATV and Apple are "competitors with respect to sale and licensing of the Beatles media content" is sufficient to establish the existence of a horizontal conspiracy for purposes of resolving this motion. *See* Am. Compl. ¶ 59; Pl. Opp. 16. Whether or not the Defendants' alleged conduct "constitutes a 'horizontal conspiracy,' and therefore is a *per se* violation, . . . is a legal conclusion that the Court does not accept as true on a motion to dismiss." *Integrated Sys. & Power*, 713 F. Supp. 2d at 290. Instead, the Court must consider whether the factual allegations of the Amended Complaint plausibly establish that the agreements between SATV and Apple—and in particular their efforts to enforce Apple's exclusive synchronization license by preventing the United States distribution of *The Lost Concert*—constitute horizontal restraints on trade that are *per se* violations of the Sherman Act.

Applying this standard, the Court finds that they would not state such a claim. Most significantly, Ace's own pleadings state that "[SATV] granted an exclusive 'synchronization' license to [Apple]." Am. Compl. ¶ 59. By thus alleging that SATV is a supplier of rights to Apple, Ace has pleaded facts introducing a "significant vertical dimension" into the relationship between SATV and Apple, which precludes it from fitting into the recognized category of *per se* violations for horizontal restraints on trade, and instead requires their conduct "to be judged according to the rule of reason." *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, No. 09-cv-

9177 (PAE), 2014 WL 812795, at *20 (S.D.N.Y. March 3, 2014) (quoting *Leegin*, 441 U.S. at

882).  This is true even when Plaintiff's allegation that Defendants are "competitors with respect

to sale and licensing of the Beatles Media content," Am. Compl. ¶ 59, is taken into account, as

"the presence of even [a] significant horizontal dimension, alongside a vertical one, does not

trigger *per se* review," *Meredith Corp.*, 2014 WL 812795, at *20 (finding that "vertical"

relationship between owners of music copyrights and entity granted right to license their work

foreclosed *per se* liability, notwithstanding that the owners sometimes competed against the

entity by licensing their work themselves).  For example, the Second Circuit has held that an

exclusive distribution agreement between a supplier and a distributor is a vertical restraint to be

judged according to the rule of reason, "even if the distributor and manufacturer also compete at

the distribution level." *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods, Inc.*, 129 F.3d

240, 243 (2d Cir. 1997).  Likewise, the exclusive synchronization license granted to Apple by

SATV is a vertical restraint that does not trigger *per se* liability, even if SATV and Apple also

compete in the licensing of "The Beatles Media." Am. Compl. ¶ 59.  Accordingly, the Court

finds that Plaintiff has failed to state a claim for a *per se* violation of Section 1 of the Sherman

Act.

### B.  Rule of Reason

Having determined that Plaintiff has failed to state a claim for a *per se* violation of

Section 1, the Court proceeds to assess the adequacy of the pleadings under the rule of reason.

That rule requires "the factfinder [to] weigh[] all of the circumstances of a case in deciding

whether a restrictive practice should be prohibited as imposing an unreasonable restraint on

competition." *Leegin*, 551 U.S. at 885 (quoting *GTE Sylvania Inc.*, 433 U.S. at 49).  In the

Second Circuit, this inquiry takes the form of a three-step burden-shifting analysis, pursuant to

14

which "the plaintiff bears the initial burden of showing that the defendant's conduct 'had an *actual* adverse effect on competition as a whole in the relevant market.'" *Arkansas Carpenters Health & Welfare Fund v. Bayer AG*, 604 F.3d 98, 104 (2d Cir. 2010) (quoting *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993)). If this burden is met, "the burden then shifts to defendant to offer evidence that its conduct had pro-competitive effects." *Id.* If the defendant meets this burden, "the burden shifts back to plaintiff, who must prove that any legitimate competitive effects could have been achived through less restrictive alternatives." *Id.* Defendants argue that Plaintiff's allegations fail at the first step of the analysis, due to Plaintiff's failure to allege harm to competition as a whole in the relevant market. Apple Mem. 13. The Court agrees.

In order to satisfy its first-step burden, a plaintiff bringing a claim under Section 1 of the Sherman Act must show that the challenged action "had an *actual* adverse effect on competition as a whole in the relevant market.'" *Arkansas Carpenters*, 604 F.3d at 104. Allegations that the plaintiff alone "has been harmed as an individual competitor will not suffice" to satisfy this requirement of adverse effect, or "antitrust injury." *Tops Mkts., Inc.*, 142 F.3d at 96 (quoting *Capital Imaging*, 996 F.2d at 543) (first emphasis in original). Failure to plead facts plausibly showing antitrust injury is grounds for dismissal. *See Integrated Sys. & Power*, 713 F. Supp. 2d at 299 (citing *Elecs. Commc'ns Corp.*, 129 F.3d at 244-46; *Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 392 (S.D.N.Y. 1993)).

The only injury alleged in the Amended Complaint is Defendants' interference with and prevention of the United States distribution of Plaintiff's film. *See* Am. Compl. ¶¶ 6, 7, 8, 10, 45, 46, 59, 61-64, 79, 82. In Plaintiff's own words, it alleges that the challenged restraints on trade "reduced output in the relevant market by completely precluding the distribution and

exhibition of [*The Lost Concert*]." Pl. Opp. 21-22. These allegations, even if accepted as true, are insufficient to plausibly establish any harm to the market for Beatles-related historical audio visual material *as a whole*, assuming for purposes of this analysis that such a market exists. *See Arkansas Carpenters*, 604 F.3d at 104. Rather, the allegations establish nothing more than the enforcement of an exclusive synchronization license, to the detriment of a single competitor within the market. *Cf. Elecs. Commc'ns Corp.*, 129 F.3d at 244-45 (finding that "run-of-the-mill exclusive distributorship controversy" did not establish harm to market-wide competition and affirming dismissal under 12(b)(6)). This is exactly the kind of "routine dispute[] between business competitors" that is not cognizable under the Sherman Act. *Capital Imaging Assocs.*, 996 F.2d at 543. Because Plaintiff has failed to allege antitrust injury, the Court need not reach Defendant's argument that Plaintiff fails to allege a relevant market in order to conclude that that the Amended Complaint does not state a claim for violation of Section 1 of the Sherman Act under the Rule of Reason.

### C. Noerr-Pennington Doctrine

Because the Court has concluded Plaintiff's allegations are insufficient to state a claim for a violation of Section 1 of the Sherman Act for failing to either define a relevant market or allege antitrust injury, it is unnecessary to reach Defendants' argument that their conduct related to the UK Action is privileged under the Noerr-Pennington doctrine, *see* Apple Mem. 13-17; SATV Mem. 15-16, or to determine whether the UK Action falls into the "sham litigation" exception to that doctrine, *see* Pl. Opp. 22-26; SATV Reply 4-6.

### D. Summary

For the foregoing reasons, the Court finds that the allegations in Plaintiff's complaint are insufficient to plead either a *per se* violation of Section 1 of the Sherman Act or a violation under the Rule of Reason. Accordingly, this claim is dismissed in its entirety.

## VI.   Tortious Interference with Contract

The Court next considers the adequacy of Plaintiff's pleadings with respect to its claim for tortious interference of contract. This cause of action is based upon allegations that SATV and Apple conspired to interfere with Plaintiff's United States distribution contract with Screenvision by "falsely stating [to Screenvision] . . . that [*The Lost Concert*] infringed on [SATV's] copyrights and demanding that Screenvision not exhibit the Documentary." Am. Compl. ¶ 125. Plaintiff alleges that, as a result of these communications, "Screenvision informed Ace that Screenvision would not authorize the Ziegfeld premiere unless Ace provided written confirmation from [SATV] by close of business on May 4, 2012, that Ace had the rights to use the songs in [*The Lost Concert*]." *Id.* ¶ 126. "When Ace could not provide such written confirmation, Screenvision cancelled the Ziegfeld premiere. Defendant's conduct interfered with the performance of the contract." *Id.* ¶ 127.

In order to state a claim for tortious interference with contract under New York law, a plaintiff must allege: (1) "the existence of a valid contract between the plaintiff and a third party," (2) "defendant's knowledge of the contract," (3) "defendant's intentional inducement of the third party to breach the contract or otherwise render performance impossible," (4) "an actual breach" of the contract, and (5) "damages to the plaintiff." *Lennon v. Seaman*, 63 F. Supp. 2d 428, 433 (S.D.N.Y. 1999) (citing *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993); *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 620 (1996)). In addition, "a

plaintiff must show that the third party would not have breached the contract 'but for the

activities of the defendant.'" *St. John's Univ., New York v. Bolton*, 757 F. Supp. 2d 144, 172

(E.D.N.Y. 2010) (quoting *Michelle Pommier Models, Inc. v. Men Women N.Y. Model Mgmt.,

Inc.*, 173 F.3d 845 (2d Cir. 1999)), and that the defendant "used 'wrongful means' to induce the

third party to breach the contract,'" *Orange Cnty. Choppers, Inc. v. Olaes Enterprises, Inc.*, 497

F. Supp. 2d 541, 561-62 (S.D.N.Y. 2007) (quoting *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d

490, 499 (S.D.N.Y. 2002)).

      Defendants first challenge the sufficiency of the pleadings on the ground that Plaintiff has

failed to allege "any breach of contract." SATV Mem. 18. The Court agrees that this element

has not been adequately pled. In reaching this conclusion, the Court disregards Plaintiff's

conclusory allegation that SATV's "communications [with Screenvision] . . . did in fact, induce a

breach and disruption of the Distribution Contract," Am. Compl. ¶ 125, as merely asserting in "a

conclusory manner that an agreement was breached" is not enough to survive a motion to

dismiss. *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 189

(S.D.N.Y. 2011) (quoting *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008)).

The Court also disregards allegations purporting to identify the particular provisions of the

Distribution Agreement that were breached as a result of Defendants' conduct, which were raised

for the first time in Plaintiff's opposition brief, *see* Pl. Opp. 26-27, as it is "axiomatic that the

Complaint cannot be amended by briefs in opposition to a motion to dismiss," *Muniz v. Morillo*,

No. 06-cv-6570 (RJS), 2008 WL 4219073, at *6 (S.D.N.Y. Sept. 10, 2008) (quoting *O'Brien v.

Nat'l Prop. Analyst Partners*, 719 F. Supp. 222, 2209 (S.D.N.Y. 1989)).

      Examining the allegations of the Amended Complaint, the Court concludes that they fail

to plausibly state that a breach of the Distribution Agreement occurred. For even if it were true

that Screenvision "cancelled the Ziegfeld premiere" after Ace's failure to produce written confirmation of its rights to use the songs, Am. Compl. ¶¶ 126-27, this would "leave open the possibility that [Screenvision] lawfully terminated the contract" without giving rise to any breach, *Orange Cnty. Choppers*, 497 F. Supp. 2d at 562; *see also Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 (2d Cir. 2006) (finding that allegation that third party had "walked away" from project was insufficient to satisfy element of breach). The Amended Complaint does not even identify the portions of the Distribution Agreement breached by Screenvision's conduct, *see Ellington Credit Fund, Ltd.*, 837 F. Supp. 2d at 189 ("[A] plaintiff must identify what provisions of the contract were breached as a result of the acts at issue."), a particularly damaging omission in light of provisions in the contract suggesting that Screenvision had "the right to suspend working on, distributing or exhibiting all or any portion of [*The Lost Concert*] for which Screenvision receives a demand or claim," Am. Compl., Ex. A. ¶ 12. For these reasons, the Court finds that Plaintiff has failed to adequately plead that there was "an actual breach" of the contract. *Lennon*, 63 F. Supp. 2d at 433.

Plaintiff's claim must fail for the additional reason that it does not adequately plead that SATV "used 'wrongful means' to induce [Screenvision] to breach the contract.'" *Orange Cnty. Choppers*, 497 F. Supp. 2d at 561-62 (quoting *Wolff*, 210 F. Supp. 2d at 499). Here, Plaintiff asserts that SATV used "wrongful means" when it "falsely" notified Screenvision that *The Lost Concert* infringed SATV's copyrights and demanded that Screenvision accordingly refrain from exhibiting the film. Am. Compl. ¶ 125. While Plaintiff is correct that such litigation activity can sometimes satisfy the "wrongful means" element, *see* Pl. Opp. 28, this is true only when (1) "the [defendant] has no belief in the merit of the litigation," or (2) the defendant otherwise "institutes or threatens to institute litigation in bad faith, intending only to harass the third parties and not to

19

bring [its] claim to definitive adjudication," *RFP LLC v. SCVNGR, Inc.*, 788 F. Supp. 2d 191, 197 (S.D.N.Y. 2011) (quoting *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 797 F.2d 70, 75 (2d Cir. 1986)). Plaintiff, however, has pleaded no facts plausibly showing that either circumstance exists in the case. Other than the conclusory and therefore insufficient assertion that SATV's asserted copyright claims are "false," the Complaint is utterly devoid of allegations showing that SATV "has no belief in the merit" of its copyright claims. *Cf. RFP LLC*, 788 F. Supp. 2d at 197 (finding that wrongful means not adequately pled, notwithstanding counter-plaintiff's allegation that the claim was "false[]"). Plaintiff's asserted legal conclusion that SATV's copyright claims lack merit because "Round Hill Music and Adage Classics are . . . the owner [sic] of all copyright and publishing rights in North America" to four of the eight songs, Am. Compl. ¶¶ 49-50, is likewise insufficient to support its claim. *See Papasan*, 478 U.S. at 286 (quoted in *Twombly*, 550 U.S. at 555). Far more probative of SATV's bad faith—or lack thereof—are Plaintiff's own allegations indicating that SATV has steadfastly maintained that it owns the rights to the Songs through every stage of its relationship with Ace and the Producers, beginning with the initial discussions over synchronization rights in 2010, *see* Am. Compl. ¶¶ 54-55, continuing through the assertions of infringement made in the UK Action and their communications with Screenvision, *see* Am. Compl. ¶¶ 72-77, up to and including the arguments made in this action, *see* SATV Mem. 14-15. This alleged constancy belies Plaintiff's assertion that SATV lacked belief in the merits of its position when it filed the UK Action and communicated its claims to Screenvision.

Nor does the Amended Complaint otherwise allege any facts plausibly showing that SATV asserted copyright claims "in bad faith" and without any intent "to bring [those] claims to definitive adjudication." *RFP LLC*, 788 F. Supp. 2d at 197. To this end, the Court finds wholly

unpersuasive Ace's contention that the fact that a consent order was entered in the UK Action

shows bad faith, insofar as it demonstrates that SATV had no intention of "pursu[ing] the UK

action to *any* adjudication." Pl. Opp. 28. To the contrary, the terms of the consent order—which

expressly bar Ace from "tak[ing] any step to exploit [*The Lost Concert*] featuring any or any

substantial part of any of the musical compositions" at issue in this case, Am. Am. Compl., Ex.

F—are favorable to SATV and consistent with their having a good-faith belief in validity of their

claims, and they cannot plausibly be understood to show that the UK Action was instigated in

bad faith. Accordingly, the Court finds that Plaintiff has also failed to plead facts showing that

Defendants employed "wrongful means."

Having thus determined that Plaintiff has failed to adequately plead that any breach

actually occurred as a result of Defendants' conduct, or that SATV's conduct in inducing a

breach was wrongful, the Court need not reach Defendants' additional arguments related to

causation, SATV Mem. 18, and Apple's lack of involvement, Apple Mem. 19, in order to

conclude that the claim must be dismissed.

## VII.    Tortious Interference with Prospective Economic Relations

Plaintiff further alleges that SATV and Apple tortiously interfered with prospective

economic relations. *See* Am. Compl. ¶¶ 133-43. Similar to Plaintiff's claim for tortious

interference with contract, this claim is based on the allegation that, "[i]n conspiracy and at the

insistence of [Apple], [SATV] conveyed false information to Screenvision and the Ziegfeld

Theater regarding the copyright status of [*The Lost Concert*]," with the intention and effect of

"disrupt[ing] Plaintiff's relationship with Screenvision, the Ziegfeld Theater, and other

distributors and exhibitors of [*The Lost Concert*]." Am. Compl. ¶ 136.

21

In order to state a claim for tortious interference with prospective economic relations, a plaintiff must allege that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Kirch*, 449 F.3d at 400. The elements of tortious interference with prospective economic relations are similar to those of tortious interference with contract, except that "the defendant's conduct must be more culpable for a claim of tortious interference with a prospective contract." *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 520 (S.D.N.Y. 2011) (quoting *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (1980)). This difference reflects the "[g]reater protection [that] is accorded an interest in an existing contract," in contrast with "the less substantive, more speculative interest in a prospective relationship." *Id.* (quoting *Guard-Life Corp.*, 50 N.Y.2d at 191).

The Court finds that Plaintiff has failed to plead facts sufficient to show that SATV acted "solely out of malice, or used dishonest, unfair or improper means" when it raised its copyright infringement claims with Screenvision. *Kirch*, 449 F.3d at 400. Again, Plaintiff's pleadings in this respect consist entirely of legal conclusions couched as factual allegations—the Amended Complaint merely asserts that "Defendant acted with malice and improper means without any legitimate business justification," Am. Compl. ¶ 134, and that its claim of copyright infringement is meritless, *id.* ¶¶ 49-50—and they are accordingly insufficient to survive a motion to dismiss, *see Lions Gate Entm't Corp. v. Icahn*, No. 10-cv-8169 (HB), 2011 WL 1217245, at *2 (S.D.N.Y. March 30, 2011) (finding that the "conclusory statement[] that [Defendant] 'knew'" that threatened legal action was baseless was insufficient to show that he "acted 'solely' out of malice or used improper means") (citing *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003)).

Moreover, as discussed in connection with Plaintiff's claim for tortious interference with contract, Plaintiff's allegations that SATV has consistently taken the position that they own the rights to the Songs actually seem to support the opposite conclusion—that SATV, at least, is not acting in bad faith. *See supra* § VI. In the absence of any factual allegations plausibly showing that SATV asserted copyright claims with Screenvision solely out of malice, the Court concludes that this claim too must be dismissed. Having determined that Plaintiff's allegations are deficient for failure to allege improper means, the Court does not reach Defendants' other arguments challenging the sufficiency of this claim. *See* SATV Mem. 20-21 (arguing that the requirement of prospective business relations is insufficiently alleged), 23 (arguing that the requirement of "but for" causation is insufficiently alleged); Apple Mem. 19 (arguing that Apple's involvement is insufficiently alleged).

## VIII.   Unfair Competition

The Court turns to Plaintiff's claim for unfair competition under state common law. New York courts "have long recognized two theories of common-law unfair competition: palming off and misappropriation." *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476 (2007) (citing *Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.2d 556, 567-68 (1959)). "Palming off" concerns "the sale of goods of one manufacturer of those of another." *Sidney Frank Importing Co., Inc. v. Beam Inc.*, 998 F. Supp. 2d 193, No. 13-cv-1391 (NSR), 2014 WL 643696, at *12 (citing *ITC Ltd.*, 9 N.Y.3d at 476). In *Shaw v. Time-Life Records*, 38 N.Y.2d 201 (1975), for example, band leader and musician Artie Shaw successfully stated a claim under the "palming off" theory by alleging that defendant Time-Life Records had dishonestly represented that its "Swing Era" records were the personal work of Shaw, although Shaw had not played a note on the albums. *See id.* at 205-06. Misappropriation similarly concerns the wrongful appropriation of "the results of the skill,

expenditures and labors of a competitor," such as by using the name of a "celebrated haute

cuisine restaurant[]" operated by another in order to appropriate that restaurant's "well-known

reputation and good will which has been built up as the result of decades of honest business

effort." *ITD Ltd.*, 9 N.Y.3d at 477 (quoting *Electrolux*, 6 N.Y.2d at 567; *Maison Prunier v.*

*Prunier's Restaurant & Café*, 159 Misc. 551, 553 (N.Y. Sup. Ct. 1936)).

   Plaintiff does not even contest Defendants' argument that its allegations—which are

again based upon the SATV's assertion of copyright infringement claims in the UK Action and

in communications with Screenvision, *see* Am. Compl. ¶ 145—are insufficient to state a claim

under either of these recognized theories of common-law unfair competition. *See* Pl. Opp. 36-

37.  Rather, Plaintiff attempts to argue that the law of unfair competition more broadly

encompasses other forms of "commercial immorality." Pl. Opp. 37 (quoting *Telecom Int'l Am.,*

*Ltd. v. AT&T Corp.*, 280 F.3d 175, 198 (2d Cir. 2001)).  But the language cited by Plaintiff

regarding "[t]he trend of the law . . . to extend the scope of the doctrine of unfair competition,"

*ITC Ltd.*, 9 N.Y.3d at 478 (quoting *Vaudable v. Montmartre, Inc.*, 20 Misc.2d 757, 759 (N.Y.

Sup. Ct. 1959), *quoted in* Pl.  Opp. 36, does not demonstrate that additional theories of liability

exist, as it is clear in the context of the case that the language refers specifically to the expansion

of the misappropriation theory to include conduct by persons not in direct competition, *see ITC*

*Ltd.* at 478 (quoting *Vaudable*, 20 Misc.2d at 759)—and not, as Plaintiff suggests the general

expansion of unfair competition claims beyond palming off and misappropriation, *see* Pl. Opp.

36 (arguing that there are more than two theories of unfair competition recognized in New York).

Indeed, none of the cases relied upon by Plaintiff recognize any form of unfair competition other

than palming off and misappropriation, *see Roy Export Co. Establishment of Vaduz, Lichtenstein*

*v. Columbia Broadcast Sys.*, 672 F.2d 1095, 1105-06 (2d Cir. 1982) (addressing unfair

competition claim brought under misappropriation theory); *Telecom Int'l Am.*, 280 F.3d at 197-

98 (same), and the New York Court of Appeals has expressly *declined* to "recogniz[e] . . . any

other new theory of liability under the New York law of unfair competition," *ITC Ltd.*, 9 N.Y.3d

at 479.  The Court accordingly finds that the absence of any allegations supporting a claim under

either the palming off or misappropriation theory requires that Plaintiff's common-law claim for

unfair competition be dismissed.

### IX.    New York General Business Law § 349

Finally, the Court considers Plaintiff's claim under New York General Business Law

§ 349(a).  Like Plaintiff's other state-law claims, this cause of action arises from SATV's

communications to Screenvision, which allegedly contained "false and/or misleading statements

regarding plaintiff's legal rights to have the [*The Lost Concert*] exhibited without a license or

permission from [SATV] and/or Apple" and "false and/or misleading statements or omissions

concerning [SATV's] and/or Apple's copyright, publishing rights and/or performing rights of the

Songs in North America."  Am. Compl. ¶ 154.

Section 349(a) declares unlawful "[d]eceptive acts and practices in the conduct of any

business, trade or commerce or in the furnishing of any service in this state."  Notwithstanding

the broad language of the statue, it has been interpreted to apply only to consumer-oriented

·conduct, *see Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85

N.Y.2d 20, 25 (1995), with the paradigmatic case "involv[ing] an individual consumer who falls

victim to misrepresentations made by a seller of consumer good[s]" because of "false and

misleading advertising," *Spirit Locker, Inc. v. EVO Direct, LLC*, 696 F. Supp. 2d 296, 301

(E.D.N.Y. 2010) (quoting *Teller v. Bill Hayes, Ltd.*, 630 N.Y.S.2d 769, 774 (2d Dep't 1995))

(second alteration in original).  Thus, in order to state a claim for violation of § 349, a plaintiff

must allege that "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Id.* at 300 (quoting *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)).

Defendants argue that Plaintiff has failed to adequately allege that SATV's deceptive conduct was directed at consumers, SATV Mem. 24, and the Court agrees. Conduct is consumer-oriented if it "ha[s] a broader impact on consumers at large," meaning that it is "'directed to consumers' *or* . . . 'potentially affect[s] similarly situated consumers.'" *Spirit Locker*, 696 F. Supp. 2d at 302 (quoting *Oswego*, 94 N.Y.2d at 25). The allegedly deceptive conduct at issue here—SATV's communications to Screenvision regarding its copyright infringement claims against Plaintiff—was plainly directed at Screenvision, which is undisputedly a business in the film distribution industry, and not a consumer. *See* Am. Compl. ¶¶ 68, 154. Furthermore, the Distribution Agreement, Am. Compl. Ex. A, targeted by the allegedly deceptive communication was a "complex arrangement[]" between "knowledgeable and experienced parties" and "involving large sums of money," which was "designed to provide services tailored to meet the [Plaintiff's] wishes and requirements," *4 K & D Corp. v. Concierge Auctions, LLC*, -- F. Supp. 2d, No. 13-cv-2527 (JGK), 2014 WL 904451, at *15 (S.D.N.Y. March 10, 2014) (citations omitted). In other words, it was plainly *not* the kind of "standard-issue" consumer-oriented transaction that § 349 is intended to protect, *id.*, but rather a "[p]rivate contract dispute[], unique to the parties" that does "not fall within the ambit of the statute," *Oswego Laborers*, 85 N.Y.2d at 25. The Court therefore finds that Plaintiff has failed to plead facts plausibly showing that the deceptive acts were directed at consumers, and that its § 349 claim must accordingly be dismissed.

The Court is not persuaded otherwise by Plaintiff's citations to cases demonstrating that competitors may have standing to pursue claims under § 349, *see* Pl. Opp 37-39, as the propriety of competitor standing has nothing to do with the requirement that the conduct alleged to be deceptive itself be consumer-oriented. The Court is also unmoved by Plaintiff's protests that, as a result of Defendants' conduct, consumers were "deprived" of access to *The Lost Concert*. Pl. Opp. 38. The mere fact that consumers were affected by the collapse of the Distribution Agreement does not mean that SATV's communications to Screenvision were directed to consumers, as they must have been in order for Plaintiff's claim to be cognizable under § 349. *See Oswego*, 85 N.Y.2d at 25. Finally, the Court admonishes Plaintiff for selectively quoting only the portion of *North State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 953 N.Y.S.2d 96 (2d Dep't 2012), stating that, "[o]n its face, [GBL § 349(a)] declares deceptive conduct unlawful without reference to whether [the deceptive conduct] has actually caused specific pecuniary harm to consumers in general," *see* Pl. Opp. 38 (quoting *N. State Autobahn*, 953 N.Y.S.2d at 102), when the very next sentence explains that the requirement of "consumer-oriented conduct . . . limits the availability of section 349(a) to cases where the deception pertains to an issue that may bear on a consumer's decision to participate in a particular transaction," 953 N.Y.S.2d at 102.

## X.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss or stay the action in deference to the previously filed UK Action is denied, and their motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is denied with respect to the claim for declaratory judgment, and it is granted with respect to the claims for violation of Section 1 of the Sherman Act, tortious interference with contract, tortious interference with prospective economic relations, unfair competition, and violation of New York General Business Law § 349.

The parties are hereby ordered to appear for an initial pretrial conference with the Court on November 7, 2014, at 10 am.  In accordance with the Court's Individual Rules, the parties are ordered to ECF file a Proposed Civil Case Management Plan and Scheduling Order (available at http://nysd.uscourts.gov/judge/Nathan) no later than seven days prior to the Initial Pretrial Conference.

Finally, the parties are ordered to include with the Proposed Civil Case Management Plan a joint letter, not to exceed three (3) pages, providing the following information in separate paragraphs: (1) a brief description of any discovery that has already taken place; (2) a brief description of prior settlement discussions, if any; (3) the estimated length of trial; and (4) any other information that the parties believe may assist the Court in resolving this action.

SO ORDERED.

This resolves Dkt. Nos. 41, 45.

Dated: September _26_, 2014
New York, New York

_____
ALISON J. NATHAN
United States District Judge